Victor H. Saldarriaga (VS2191)  **ECF CASE**
THE SALDARRIAGA LAW FIRM
275 Madison Avenue, Suite 1605
New York, New York 10016
(212) 682-4904

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
                                                                                 :
LOURDES BARBA,                                          :     07 CV 2443 (LTS)
                                                                                 :
                                   Plaintiff,                   :
                                                                                 :     **AMENDED COMPLAINT**
                 - against -                                   :
                                                                                 :
DATA CENTRUM COMMUNICATIONS, INC., :
                                                                                 :
                                   Defendant.              :
-----------------------------------------------------------------X

Plaintiff LOURDES BARBA ("BARBA" or "Plaintiff"), by her attorneys the THE SALDARRIAGA LAW FIRM, complaining of Defendant DATA CENTRUM COMMUNICATIONS, INC., ("DCC" or "Defendant"), alleges as follows:

### JURISDICTION AND VENUE

1. This action seeks declaratory and equitable relief, backpay, compensatory and punitive damages, attorney's fees and costs, and other relief to redress: discrimination in employment on the basis of race and sex, and retaliation for opposing unlawful employment practices suffered by LOURDES BARBA in her treatment while employed by DCC.

2. This action is brought pursuant to: the Reconstruction Era Civil Rights Act, codified at 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, ("§ 1981"); New York State Human Rights Law, New York Executive Law §§ 290 *et seq*., ("NYSHRL"); and the New York City

Human Rights Law, New York City Administrative Code § 8-101 *et seq.,* ("NYCHRL").

3.      This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343, and the principle of pendent jurisdiction.

4.      The employment practices and acts of discrimination alleged in this Complaint were committed within the Southern District of New York and therefore venue lies in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

5.      Plaintiff is a Hispanic female of Ecuadorian descent who was an employee of Defendant at its New York City operations for approximately four years.

6.      Upon information and belief, Defendant is a domestic corporation engaged in publishing healthcare information with main offices located at: 21 West 38th Street, 4th Floor, New York, New York 10018.

## FACTS

7.      Plaintiff was first employed by Defendant in April of 2000, in the position of Subscription Manager.

8.      Throughout her employment with DCC, Plaintiff met applicable job qualifications, was qualified for the position which she held, and performed the job in a matter which fully met DCC's legitimate expectations.

9.      Plaintiff received bonuses for her efforts at the end of every year of her employment with DCC.

10.     In particular, at the end of 2003, Plaintiff received from Defendant a $1,500.00 raise and $1,500.00 bonus.

11. At all relevant times, Eric Jensen ("Jensen"), a white male, was the President and co-owner of DCC.

12. At all relevant times, William Dwyer ("Dwyer"), a white male, was employed by Defendant as Vice-President of Operations.

13. At all relevant times, Dwyer was Plaintiff's immediate supervisor.

14. At all relevant times, Ed Graham ("Graham"), a white male, was employed by Defendant as Director of Publications.

15. Throughout her employment with DCC, but most prevalent after May 2003, and continuing to February 2004, Plaintiff was subjected to pervasive and severe harassment by Graham who often made lewd, unwelcomed sexual advances and racial epithets to or about Plaintiff, including the following:

   a. On numerous occasions, Graham told Plaintiff that he "would love to sexually molest her."

   b. On numerous occasions, Graham would tell Plaintiff that he like her figure while extending his arms and cusped his hands to signify large breasts.

   c. On or about May 14, 2003, while Plaintiff was standing by the photocopying machine, Graham told Plaintiff that he "loved her **spic** ass," and proceeded to smack Plaintiff's buttocks with a folder.

   d. On or about June 3, 2003, and many other times thereafter, Graham called Plaintiff his "little **spic** girlfriend."

   e. In or about June, 2003, Graham told Plaintiff that "all Hispanic women are good for is to cook and clean."

16. Although, Plaintiff told Graham to stop making such sexist, racial and degrading remarks and not to touch her, Graham did not stop.

17. On or about September 5, 2003, immediately after receiving a memorandum from Jensen regarding DCC's anti-harassment and anti-discrimination policy, Plaintiff complained to Dwyer that Graham's racial epithets and physical and verbal conduct of a sexual nature created an offensive and hostile environment for her to work in, and as such, she did not want to tolerate it any longer.

18. Although Dwyer admitted to Plaintiff that he had witnessed Graham's behavior towards her, Dwyer took no immediate action and only recommended that Plaintiff speak to Graham about it.

19. Contrary to DCC's anti-harassment and anti-discrimination policy, upon information and belief, no official investigation was conducted, and the illegal behavior was never redressed.

20. In September 2003, only a few days after Plaintiff's complaint to Dwyer, Graham made additional racial and sexist remarks about the Plaintiff in the presence of Dwyer, by stating that "I saw [Plaintiff] in a dirty movie last night" and "my little **spic** girlfriend is sexier than Catherine Zeta-Jones."

21. However, Dwyer said nothing to Graham about those sexist and racial remarks. And contrary to DCC's anti-harassment and anti-discrimination policy, no corrective action was ever taken against Graham.

22. In October 2003, when Plaintiff expressed her desire to learn how to use the PowerPoint software program to make presentations to the Sales Department, Dwyer only allowed Plaintiff to learn on her own free time while white, male employees were permitted to attend outside

training sessions for software programs.

23.    In early February 2004, after Graham wanted to tell Plaintiff about his "wild night with several **spic** girls," Plaintiff again complained to Dwyer about Graham's sexual remarks and racial epithets.

24.    Plaintiff told Dwyer that Graham's relentless and perverse sexist remarks and racial epithets were now starting to interfere with her work performance in that she, at times, could not concentrate on her work.

25.    However, during the meeting with Dwyer in connection with her second complaint of harassment, Dwyer also made some sexist and racial remarks to Plaintiff.

26.    Dwyer told Plaintiff that she "was much sexier than she used to be."

27.    Dwyer also asked Plaintiff "what type of attention was she receiving from men on the outside because she was now a slim Hispanic woman?"

28.    Nonetheless, Dwyer told Plaintiff that Graham's racial epithets and physical and verbal conduct of a sexual nature towards her were "inappropriate."

29.    But again, contrary to DCC's anti-harassment and anti-discrimination policy, upon information and belief, no official investigation was conducted, and the illegal behavior was not redressed.

30.    Instead, after the second complaint, Dwyer began to unduly scrutinize and criticize Plaintiff's work performance, attendance and punctuality by closely monitoring Plaintiff's arrival time to work and assignments.

31.    This eventually led to Dwyer filing a frivolous charge against Plaintiff of being chronically late.

32. On March 11, 2004, although DCC did not keep official time records, Dwyer accused Plaintiff of allegedly coming in to work about ten minutes late on two separate occasions even though other employees, in particular, white, male employees, frequently arrived to work more than thirty minutes late.

33. Later that day, after becoming angry with Plaintiff for no legitimate reason and without issuing any formal termination letter, Dwyer terminated Plaintiff from her employment with DCC. Plaintiff immediately thereafter went to see Jensen.

34. After complaining to Jensen about her disparate treatment at DCC, Plaintiff was permitted to stay in her position for an additional sixty (60) days while she looked for other employment.

35. Dwyer was dismayed that Plaintiff was rehired by Jensen.

36. On March 15, 2004, Dwyer presented to Plaintiff a contingent work agreement for her review and signature. Dwyer told Plaintiff that she had three days to sign the agreement.

37. However, on March 16, 2004, Dwyer presented to Plaintiff a new contingent work agreement with significant changes contained therein for her review and signature.

38. On or about March 17, 2004, after Plaintiff did not want to sign the new contingent work agreement without advise of counsel, Dwyer became angry with her and terminated her employment with DCC.

39. Since Dwyer had terminated Plaintiff the week before because he was angry with her, Plaintiff wanted to get confirmation from Jensen as to her employment status with DCC, but he was present at DCC on March 17, 2004.

40. As a result, on March 17, 2004, before leaving, Plaintiff left a message for Jensen to

call her. Moreover, further communication with Defendant about their treatment of Plaintiff at DCC was made by and through her counsel, Victor H. Saldarriaga, Esq., on that same day.

41.   On March 26, 2004, Plaintiff's attorney received a facsimile transmission from Defendant by and through their legal counsel, Greenberg and Traurig, LLP. In a letter dated March 26, 2004, Defendant's counsel established and communicated DCC's official position with respect to Plaintiff's employment in that she had been indeed terminated from her employment effective March 17, 2004, for among other things, serial lateness and failure to perform assigned work.

42.   Although the Defendant's counsel's letter acknowledged a harassment complaint made by Plaintiff, counsel refused to disclose any documents regarding Plaintiff's file or any investigation made by Defendant regarding Plaintiff's harassment complaint.

43.   Defendant's reasons for discharging Plaintiff from her position were pretextual and the Defendant only started the paper trail to eventually terminate her.

44.   The Plaintiff's race and sex were motivating factors in Defendant's decision to discharge Plaintiff because other employees who are not of the same race and sex as Plaintiff were not treated in this manner.

45.   Moreover, Plaintiff was retaliated against because she exercised her legal right to complain about unlawful treatment at work and was terminated from her employment shortly thereafter.

46.   As a result of this course and pattern of harassment, humiliation, and discriminatory conduct, Plaintiff suffered and continues to suffer mental and emotional distress.

47.   Plaintiff has sought psychological counseling for depression and nervousness caused by her treatment as an employee of DCC.

48. Plaintiff has been discriminated and retaliated against in violation of the § 1981, NYSHRL and NYCHRL.

49. Plaintiff seeks declaratory and injunctive relief and any and all compensatory, punitive or other damages available to her under law.

### First Claim for Relief

50. Paragraphs 1 through 49 are incorporated as if fully set out herein.

51. Defendant's acts, practices, and policies alleged in this Complaint constitute intentional discrimination on the basis of race in violation of § 1981, thus requiring the relief hereinafter demanded.

### Second Claim for Relief

52. Paragraphs 1 through 49 are incorporated as if fully set out herein.

53. Defendants' act of terminating Plaintiff's employment constituted an act of retaliation against Plaintiff for filing complaints of discrimination. Defendant's acts of retaliation were in violation of § 1981, thus requiring the relief hereinafter demanded.

### Third Claim for Relief

54. Paragraphs 1 through 49 are incorporated as if fully set out herein.

55. Defendants' acts, practices and policies which discriminated against Plaintiff on account of race and sex constitute violations of NYSHRL thus requiring the relief hereinafter demanded.

### Fourth Claim for Relief

56. Paragraphs 1 through 49 are incorporated as if fully set out herein.

57. Defendants' act of terminating Plaintiff's employment constituted an act of retaliation

against Plaintiff for filing a complaints of discrimination. Defendant's acts of retaliation were in violation of NYSHRL thus requiring the relief hereinafter demanded.

### Fifth Claim for Relief

58. Paragraphs 1 through 49 are incorporated as if fully set out herein.

59. Defendants' acts, practices and policies which discriminated against Plaintiff on account of race and sex constitute violations of NYCHRL thus requiring the relief hereinafter demanded.

### Sixth Claim for Relief

60. Paragraphs 1 through 49 are incorporated as if fully set out herein.

61. Defendants' act of terminating Plaintiff's employment constituted an act of retaliation against Plaintiff for filing a complaints of discrimination. Defendant's acts of retaliation were in violation of NYCHRL thus requiring the relief hereinafter demanded.

### Jury Demand

62. Plaintiff demands trial by jury.

### Prayer for Relief

63. **Wherefore**, Plaintiff prays that this Court:

(a) declare Defendants' conduct to be in violation of her rights;

(b) enjoin Defendants from engaging in such conduct;

(c) award Plaintiff backpay with interest;

(d) award Plaintiff reinstatement or front pay until normal retirement age;

(e) statutory liquidated damages due to the Defendant's willful conduct;

(f) award Plaintiff compensatory damages the amount to be determined at trial for emotional distress, mental anguish, and humiliation;

(g)     award Plaintiff punitive damages the amount to be determined at trial;

(h)     award Plaintiff pre-judgment interest on all monetary awards;

(i)     award Plaintiff costs and attorney's fees; and

(j)     grant such other relief as it may deem just and proper.


Dated:  New York, New York
        September 19, 2007

                                        Respectfully Submitted,

                                        THE SALDARRIAGA LAW FIRM

                                        By: /s/ Victor H. Saldarriaga (VS2191)

                                        275 Madison Avenue, Suite 1605
                                        New York, New York 10016
                                        (212) 682-4904

                                        Attorneys for Plaintiff

## **CERTIFICATE OF SERVICE**

      I hereby certify that on September 20, 2007, I arranged for this document to be electronically served upon defendant's counsel:

          PHILLIPS NIZER LLP
          666 Fifth Avenue
          New York, New York 10103-0084

                              /s/ Victor H. Saldarriaga (VS2191)